IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

**HETRICK COMPANIES LLC,**

    **and**

**PHILIPPE HETRICK**

        Plaintiffs

    v.

**IINK, CORP.**

        Defendant

Docket No. 1:23-cv-961

---

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

---

*Who steals my purse steals trash*

- Othello, Act III

## INTRODUCTION

In a relationship where Defendant electronically stored and managed the sensitive information of Plaintiffs, the Defendant panicked when it was alerted *by Plaintiffs* to a suspicious online intrusion concerning Plaintiffs own data. Plaintiffs' warning was timely; no financial harm resulted. Nevertheless, Defendant suspected Plaintiffs. Defendant transmitted Plaintiffs' sensitive data without restriction to two of Plaintiffs' largest commercial affiliates with disparaging, and unsupportable conclusions. Plaintiffs sued on defamation claims, trade secret claims, and federal criminal electronic/computer storage statutes concerning unauthorized disclosure of data of various types.

Now Defendant moves to compel arbitration pursuant to a data storage agreement signed by the Parties. Plaintiffs do not allege claims based on that Agreement. This Circuit as a general rule gives effect to arbitration provisions: unfailingly when a contract claim is alleged, and usually when a tort between two parties are bound by contract. This case, however, has a new twist.

It is of first impression in this Court and the Circuit that the Defendant seeks arbitration based on torts commensurate with criminal statutes and acts. The Fifth, Eleventh, and Seventh Circuits all agree that such cases will not be bound by arbitration clauses from a contract creating the parties' relationship. A recent Fourth Circuit case indicated that the Court is ready for a case to provide the exception to the general rule.

## FACTS

Plaintiff Philippe Hetrick, ("Phillipe") and his co-plaintiff company, Hetrick Companies LLC ("HetCo"), provide public adjusting services. Compl., Dkt. 1, pars. 5-6.  For the wide range of clients, banks, insurance companies, supply companies, etc. with which HetCo works, checks often need to be endorsed by multiple parties – often a burdensome number. Dkt. 1, pars. 7-9.   Defendant IINK, Corp. ("Defendant") is an online payment check endorsement company ("Defendant  Services"). In 2022 HetCo signed an agreement ("Terms of Use") with Defendant to utilize Defendant Services. Dkt. 1, par. 12. The

Terms of Use included an arbitration provision faithfully reproduced by Defendant in their motion brief. Dkt. 13-1 at pp. 2-3.

In June 2023, an employee of HetCo while reviewing the HetCo online dashboard for the Defendant Services noticed that HetCo's list of pending clients were linking to a bank account that HetCo did not recognize, a bank account ending in 743 (the "False Account"). Dkt. 1, par. 14.  As HetCo had only two other accounts, the False Account was conspicuous. Two accounts were valid, one was not. HetCo contacted Defendant immediately, and in time, to warn it of the False Account and to cancel unauthorized payments to the False Account. Dkt. 1, pars. 15-16.

After not hearing from Defendant for days, in early July, Phillipe received a communication from a colleague at Shanco Companies, LLC ("Shanco") stating that Shanco employees received distressing comments from their parent company Feazel, Inc. ("Feazel"), concerning Phillipe and HetCo from Defendant. Dkt. 1, pars. 9, 22.  Shanco, the DMV-area's largest roofing company, is HetCo's largest source of customers and work. Dkt. 1, pars. 9-10.  Shanco is a subsidiary of Feazel, one of the nation's largest roofing companies.  Dkt. 1, pars. 9-10.

A few days later, Phillipe received an e-mail from Joseph Stephens ("Stephens"), a Shanco manager, asking Phillipe to dispel certain statements made by Defendant to Feazel and Shanco. Dkt. 1, par. 23.  One of the emails that Stephens forwarded to Phillipe was from Tom McGrath, CEO of Defendant to Justin Hook, of Feazel. That July 11, 2023 message included the following:

> I have strong reason to believe the public adjusting firm…Hetrick Companies LLC … you are working with [is] committing fraud and that Feazel and Shanco have been implicated in that fraud.

Dkt. 1, par. 22; and Decl. Of Phillipe Hetrick, par. 4. A series of telephone calls, other emails, forwarded emails, and extended meetings between Phillipe and revealed that Defendant made the other following statements to Feazel and/or Shanco.

- That Phillipe lied about his age, and that Phillipe was really only twenty two years old.
- That  Phillipe was born in Russia.
- That Phillipe's public adjuster license had expired.

- That IINK had been hacked, and that Phillipe was involved because Phillipe has previously used a Russian IP address, and someone with HetCo credentials was "logged in" at the alleged time of the hacking.
- That Phillipe had friends in Africa, as evidenced by nothing more than photographs on his social media, who aided him in the alleged hack.
- That Phillipe's father had a criminal background.
- That Phillipe was in violation of sanctions placed upon Russia by transmitting monies into that country.
- That multiple HetCo transactions were suspicious because they involved "dead people" and "widows" and that Phillipe has a past history of stealing identities of dead homeowners.
- That Defendant was working with the Secret Service at the time to investigate Hetrick and HetCo's unauthorized transfer of monies to Russia. (This was after Feazel communicated to Defendant that every transaction of which it was aware in the Data Dump was valid).

Dkt. 1, par. 22.

The Defendant, who had access to most of HetCo's clients (at least those requiring multi-party check endorsements) transmitted the entire portfolio of business, i.e. 199 client matters, as existed on the Defendant system at that time (the "Data Dump"), including client matters, transactions, client PII, financial information, etc. ("Confidential Client/Transaction Information") to employees of Feazel. Dkt. 1, par. 20. Feazel then sent the Data Dump to Shanco. Dkt. 1, par. 25. Shanco sent the Data Dump to Phillipe. Dkt. 1, par. 25.

Defendant sent Shanco/Feazel everything. Dkt. 1, par. 25. Defendant had not narrowed suspicious data for Feazel's review. For example:

- o Defendant had not winnowed data based on the *single* fraudulent account;
- o Defendant sent data for the valid accounts too;
- o Defendant had not excised data to the minimum necessary to validate a transaction;
- o Defendant had not even utilized any form of restriction (e.g., a nondisclosure agreement); Decl. of Phillipe Hetrick, par. 3.
- o Defendant did not restrict the data to transactions to which Feazel/Shanco were parties – and they were parties to approximately 80% of the transactions. *And see*, Dkt. 1, par. 10.

Treason, hacking, identity fraud, illicit wire transfers, falsified credentials, scamming widows, and vaguely menacing "implications" of fraud from inapplicable government agencies, etc.: the list was long and scandalous. Feazel in its immediate review found nothing wrong, and gave Shanco the "green light"

to wrap up remaining matters. Dkt. 1, pars. 10, 22(i).  Feazel ordered Shanco to drop HetCo in the Esperanto of large companies: Feazel embarked on a security review that would last an indefinite period of time. Dkt. 1, par. 27.  According to an employee of Shanco, this review appeared as a "witch hunt" as it only affected HetCo. Dkt. 1, par. 28. Subsequent to July 1, 2023 Shanco would send no more business to HetCo. Dkt. 1, par. 26.

## SUMMARY

Defendant sees this case as one principally of contract, but Plaintiffs through their well-pled complaint believe otherwise. There is a contract with an arbitration provision between HetCo and Defendant, but no contract between Phillipe and Defendant. Arbitration provisions require a 'significant relationship,' or 'foreseeable nexus,' between the contract and any torts arising from a relationship based on the contract, depending on whether this Court applies the law of this Circuit or the Eleventh Circuit, respectively. The entirety of caselaw speaks with one voice: torts involving acts co-extensive with crimes, unless near-expressly referenced in the arbitration provision, are not subject to arbitration. Furthermore, the torts featured in the complaint do not 'arise out of' the contract. Even the Constitution may rear its head to compel the application of a jury. Whatever the business' lot, Phillipe is not subject to the equitable estoppel principles that would mandate his participation in his business' arbitration. Venue is appropriate in this Court because Defendant has not supplied a basis to overcome the presumption of venue due a plaintiff, and applicable factors strongly weigh in favor of venue in this Court.

## ARGUMENT

## I. ENFORCEABILITY OF ARBITRATION PROVISIONS AGAINST A PARTY

Plaintiffs concede that there is a broad mandate from the Supreme Court to favor finding arbitration clauses enforceable for contractual matters based on the Federal Arbitration Act, 9 U.S.C. §1, et. seq. (the

"FAA"). Plaintiffs further concede that there is a strong current in the caselaw to find arbitration clauses enforceable for torts 'arising out of' contractual relationships. Caselaw does not, however, support enforcing arbitration provisions concerning conduct co-extensive with, or supportive of, criminal activities. The torts of this case are heavy with Title 18 claims (with civil provisions). When Defendant divulged HetCo's confidential information, it acted tortiously; when it included HetCo, and its customers and affiliates PII, it crossed the line into criminal. Criminal acts do not arise from a data storage and use relationship.

### A.   DEFENDANT'S ACTIONS WERE TOO ATTENUATED FROM THE TERMS OF USE TO HAVE A SIGNIFICANT RELATIONSHIP THEREWITH

It is a universal requirement to require at least a significant relationship between the transaction underpinning a contract and arbitration for a tort 'arising' therefrom. A federal court is to look to the state law to determine whether a party may be compelled to arbitrate a dispute, *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944 (1995), but to the federal substantive law to determine arbitrability. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). Virginia requires a nexus between relationship between the transaction and the enforceability of arbitration clauses to torts claims: there must be "a significant relationship …between the asserted claims and the contract in which the arbitration clause is contained." *Decisive Analytics Corp. v. Chikar*, 75 Va. Cir. 337, 343 (Fairfax Cir. Ct. 2008). There is a strong presumption of arbitrability that mandates a court to require the parties to submit to arbitration if the scope of an arbitration clause subject to the federal act is open to question. *American Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88, 92 (4th Cir. 1996). Ultimately, a court must compel arbitration pursuant to an agreement covered by the FAA "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960).

There is an odd undercurrent in federal caselaw concerning enforcement of arbitration contracts. Almost without fail; a district court judge finding in favor of compelling arbitration lightly disparages the cartoonishly large scope of arbitration provisions by posing a hypothetical, or twist of fact, that would make the provision laughably unconscionable. Courts and commentators have dubbed such clauses "infinite" arbitration clauses.

Judge Posner in the Seventh Circuit made no bones about refusing to enforce so-called "infinite" arbitration clauses. *Smith v. Steinkamp*, 318 F.3d 775, 777 (7th Cir. 2003). In *Steinkamp*, plaintiff took out a payday loan from defendant and signed an agreement "to arbitrate 'all disputes' between the [p]arties." *Id*. at 777. Plaintiff later borrowed again from defendant, but without signing a second arbitration agreement. When plaintiff sued the defendant stating violations state usury laws and RICO, the defendant moved to compel arbitration,[1] which the district court denied. *Id*.  The Seventh Circuit affirmed: an arbitration clause that lacked any sort of "limiting principles" that would establish a significant relationship between the first loan and the second loan, other than that fall into the broad language of "disputes," fails any sort of contractual construction.[2]  *Id* at 777-78.

Posner is not often beaten to the punch, but the Eleventh and Fifth Circuits did just that – but with a broader set of holdings. In *Seaboard Coast Line Railroad Co. v. Trailer Train Co.*, 690 F.2d 1343 (11th Cir. 1982), the parties had a contract to lease railcars and a contract to license railcars; only the license contract had an arbitration clause. The plaintiff claimed that the defendant breached the lease contract by failing to submit tax documents verifying certain leases. The defendant argued that any "furnishing" of a railcar was covered by the license contract and its arbitration clause. The Eleventh Circuit denied arbitration on the ground that the two contracts were unrelated transactions. *Id*. at 1351. In *Texaco, Inc. v.*

---

[1] Posner commented offhand, that perhaps the real source of the arbitration demand was to keep the case, which involved extortionate interest, short-term loans (aka "loansharking") away from a courthouse. *Id*. at 776.  Our Defendant is perhaps not so keen on having a Northern Virginia jury heavy with immigrants bearing IT security credentials and military service members from seeing the outrages of falsely accusing an immigrant of treason in a time of war. Plaintiffs aren't worried in the slightest; bring on the veterans and the security experts!

[2] Also, Posner had his own set of hypotheticals, including murder, conversion, etc. *Id*. at 777.

*American Trading Transportation Co.,* 644 F.2d 1152 (5th Cir. 1981), the court considered a contract where the arbitration clause was a ship charter. The tort: negligent piloting and the ship's unseaworthiness allegedly caused damage to the party chartering the ship. The Court rejected arbitration of the ensuing tort claim on the grounds that the "complaint at bar is not the result of a difference or dispute arising out of the Charter." *Id*. at 1154.

In a later Eleventh Circuit case, a plaintiff attempted to enforce an infinite clause using the broader "related to" language rather than "arising under" language. *Telecom Italia, SPA v. Wholesale Telecom Corp.*, 248 F.3d 1109, 1115 The result was the same. In denying the defendant's motion to compel arbitration, notwithstanding the broader language, the court stated:

> It is possible to harmonize the results in [Fifth and Eleventh Circuit caselaw] by focusing on whether the tort or breach in question was an immediate, foreseeable result of the performance of contractual duties.

*Id*. at 1116.

Multiple Ninth Circuit district court cases are joining Posner, et al. in reeling in infinite clauses. *See e.g., In re Jiffy Lube Int'l, Inc.*, 847 F. Supp. 2d 1253, 1262 (11th Cir. 2012). In *Jiffy Lube*, a class of consumers sued defendant, an owner of oil-change franchises. The plaintiffs alleged that defendant had violated the TCPA by harvesting their phone numbers when they received oil changes and then sending them spam text messages. *Id*. at 1255-56. The defendant contract required arbitration of "any and all disputes, controversies or claims between [the defendant] and you." *Id*. at 1262. The court denied the motion to compel arbitration based on a statutory violation that had so little in common with the contractual services. *Id*. As an afterthought, the court surmised that the clause may also have been unconscionable, and that the defendant walked a fine line urging the court to "construe this agreement narrowly enough to avoid invalidation, but broadly enough to encompass the claims at issue in this case." *Id*. at 1263.

The Fourth Circuit, when invited to consider West Virginia contract law on a similar set of facts as *Jiffy Lube*, arrived at a narrower conclusion in *Mey v. DIRECTV, LLC*, 971 F.3d 284 (4th Cir. 2020). In *Mey*, a plaintiff sued a satellite television service provider and others, alleging that they violated the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227, by calling her cellular telephone to advertise defendant's services. *Id.* at 286.When the defendant moved to compel arbitration, asserting that the dispute was covered by an arbitration agreement between plaintiff and an affiliate of the defendant, the West Virginia district court denied the motion and an appeal followed. *Id*. When the district court took issue with the incredible breadth of the arbitration clause, noting that the clause subsumed a bizarre array of torts and causes of action, the Fourth Circuit majority opinion vacated the ruling, noting that the district court "got the standard backwards:"

> The court asked whether the arbitration agreement was "susceptible of a construction limiting the duty to arbitrate to disputes arising under or relating to the provision of cellular telephone service." In other words, the court resolved the motion to compel by asking whether the arbitration agreement could be interpreted not to cover this dispute. But precedent requires us to ask the opposite: whether the arbitration agreement is "'susceptible of an interpretation that covers the asserted dispute."

*Id* at 292 (citations omitted). The majority opinion's remand instructions may be of interest in this case; the district court analyzed the merits of the case under the *Steinkamp* and *Jiffy Lube* rubric, *Mey v. DirecTV, LLC*, 2018 U.S. Dist. LEXIS 231343, *11, 16, (W.D.Va 2018) but did not feel the need to make a ruling concerning the potential unconscionability of the arbitration clause. The arbitration clause at issue contained a scope that the Fourth Circuit noted lacked equal in the caselaw:

> the phrase "all disputes and claims between us" includes Mey's claims that [defendant] violated the TCPA by calling her to advertise satellite television products and services….Nothing about the phrase is limited to disputes or claims arising out of or relating to the underlying contract or the provision of wireless service. (And recall that defendant is included in "us" because it is an affiliate of [the party of the underlying contract].) …[including but not] limited to . . . claims arising out of or relating to any aspect of the relationship between us."

*Id*. at 293-94.

However, the ultimate fact of consequence in the ruling involved that the infinite clause included within its ambit the exact action that formed the basis of the complaint, the use of telephone communications in violation of the TCPA.:

> Of particular relevance, [the agreement] elsewhere states that Mey "consent[s] to the use by us or our authorized agents of regular mail, ***predictive or autodialing equipment***, email, text messaging, facsimile or other reasonable means to contact you to advise you about our Services ***or other matters we believe may be of interest to you.***"

*Id*. at 294 (emphasis retained).

However, all cases discussed thus far in this subsection have been general torts or regulatory violations based on contract. The next category of claims takes this case beyond the extents of the Fourth Circuit caselaw: criminal acts with civil remedies.

The Fifth Circuit declared in *Jones v. Halliburton*, 583 F.3d 228 (5th Cir. 2009), that the "the outer limits of the 'related to' language of the arbitration provision have been tested, and breached." In *Jones*, plaintiff, an employee of defendant, was sexually assaulted by her co-workers, and when sued, the defendant moved to compel enforcement of the arbitration clause in the employment contract. *Id.* at 240. The district court denied the motion, and the Fifth Circuit agreed: "what allegedly occurred would not be 'related to' Jones' employment" and "d[id] not 'touch matters' related to her employment, let alone have a 'significant relationship' to her employment contract." The Eleventh Circuit in *Doe v. Princess Cruise Lines, LTD*., 657 F.3d 1204 (11th Cir. 2011) reached a similar conclusion on a similar set of facts.

State courts that have considered the relationship between criminal torts and arbitration agreements are in accordance. In *Valued Services of Kentucky, LLC v. Watkins*, the defendant received a payday loan from plaintiff that contained an infinite clause. 309S.W.3d 256,258-61(Ky.Ct.App.2009). On the payment due date, the defendant went to the plaintiff's place of business to inform the manager that he needed an extension. *Id*. at 258.  The manager pushed a button that locked him in an office, stating: "I have a black guy over here that refuses to pay his bill and he's not going to leave until he does." *Id*  The defendant, who was detained until the police arrived, sued the plaintiff for false imprisonment. *Id* at 259. The court, upon

denying the plaintiff's demand for arbitration, relied on the gross unfairness of an arbitration provision that encompasses criminal behavior, and the trial court equating it to sending "2 men to [p]laintiff's house to break his legs because he was behind in his payment." *Id.* at 261, 265.

The hypotheticals so often discussed in discouraged federal judge's opinions are realized in the present case. Defendant engaged in tortious conduct so reckless that the underlying acts constitute crimes…business-wrecking crimes!  HetCo is commercial rubble. Plaintiffs ask this Court to draw the line here: *infinite arbitration clauses will not be enforced when the defendant's tortious actions are so beyond the scope of the transaction that they are co-extensive with criminal acts*. Every federal tort in this complaint is based on a private cause of action under Title 18. Under no circumstances could HetCo foresee that Defendant in the face of security uncertainty would maliciously divulge all of HetCo's data to its affiliates, and sometimes competitors, without restriction. How could HetCo foresee such an act, and if so, sign such agreement?

Defendant's president did not simply 'warn' Feazel of Plaintiffs' alleged problems, he interrupted a family gathering of a Feazel corporate officer to do so.

> So the main concern is a public adjusting firm you guys are working with called Hetrick Companies, LLC nm by Phillipe Hetrick. I hate to pull you away from family but I do think it's worth discussing if you have time today for 15-20 minutes. Ar·e you at all familiar with this firm?

Decl. of Phillipe Hetrick, par. 4. This is not garden variety trade secret misappropriation. This is calculated character destruction that used trade secrets, and federally sacrosanct PII.  The ratio between the self-assuredness of the Defendant and the supportive evidence is striking, and consequently malicious.

Plaintiffs conspicuously pled more than the simple taking of trade secrets, but those trade secrets included PII. PII entrusted to HetCo is subject to multiple, elevated statutory protection mechanisms. In addition to Red Flag Rules, etc, Virginia has 'Breach of Personal Information Notification' provisions among its computer crime provisions. Va. Code Ann. § 18.2-186.6(D). These are in addition to the federal computer/storage crimes listed in the complaint.

11

**B.  DEFENDANT'S ACTIONS DO NOT "ARISE OUT OF" THE TRANSACTION BETWEEN THE CONTRACTING PARTIES**

For an oft-cited statute, FAA caselaw features minimal analysis concerning its key "arising out of" language.  According to the statute:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration *a controversy thereafter arising out of such contract or transaction*, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable.

9 U.S.C. § 2. (Emphasis added). The statute grants broad federal arbitration powers to entities for the purposes of resolving disputes concerning 'transactions,' not 'parties.' The statute has no power to go beyond 'transactions;' and infinite arbitration provisions that utilize a contract between to parties in an attempt to arbitrate all future, miscellaneous acts between the parties irrespective of the relationship to the transaction of the contract. Judge Harris in *Mey*, filed a cutting dissent, significantly lengthier than the majority opinion, in which she pointed out many glaring problems with the majority opinion's ruling. This 'party' approach, rather than a 'transaction approach,' was among her compelling critiques.

In her dissent, J. Harris cited the law review article: David Horton, Infinite Arbitration Clauses, 168 U. Pa. L. Rev. 633, 678-683 (2020) (hereinafter "Infinite Arbitration Clauses")[3] - which, admittedly, is where the undersigned was first exposed to the idea. See Appendix.

In summary of Howard, when Congress first considered the FAA, it had two options before it based on state statutes passed in the 1920s, the New York model and the New Jersey model. The New Jersey model was broader than the New York model and expressly allowed broad arbitration powers between any two parties having a relationship. The New York model restricted the arbitration powers to

---

[3] https://scholarship.law.upenn.edu/cgi/viewcontent.cgi?article=9691&context=penn_law_review. As courtesy copy with relevant portions is provided to the Court in the Appendix.

transactions. The draft records show that initially Congress started with the New Jersey model, but then narrowed the language to adopt New York's "arising…out of…[the] contract" language. Furthermore:

> In addition, courts implicitly acknowledge that § 2's authority diminishes as the gap between the lawsuit and the container contract widens. As noted, when judges apply the "touch matters" or "significant relationship" tests, they liberally invoke doctrines such as unconscionability, reasonable expectations, and *contra proferentem*. The fact that state law plays an outsized role in this sphere suggests that the FAA's power fades when a claim only "relates to" the agreement.

*Id.* at 681.

Although uncited by Horton's article, courts issuing decisions just-prior or contemporaneous to his writings are beginning to reach the same conclusion. *See Hearn v. Comcast Cable Commc'ns, LLC*, 415 F. Supp. 3d 1155, 1158, 1165 (N.D. Ga. 2019) (holding that arbitration provision that "deviates from the statutory language of the Federal Arbitration Act," purporting to cover "any claim or controversy," manifests intent to arbitrate only those claims arising under or related to the contract). Plaintiffs recommend to the Court this approach to rein in the presently unbounded scope of Section 2, particularly in light of the Constitutional issues that it invokes peculiar for torts.


## C. PREEMPTING THE PREEMPTOR: THE SEVENTH AMENDMENT COULD PREEMPT THE FAA

### 1. Know Your Roots

Much has been made about the FAA's capacity to preempt state law notions of arbitrability. Looming in the FAA's shadow, although seemingly unseen by the courts, are the Constitutional issues. The Seventh Amendment assures: "In Suits at common law…the right of trial by jury shall be preserved." U.S. Const., Amend. VII. However, a jury is not merely a mechanism for distinguishing an act's factual underpinning, but also the factual aspects of the result, e.g. damage. In other words, how a jury feels about a set of factual circumstances not only matters, but is one of its historical functions. Sending a case to

arbitration not only deprives the claimant of a jury trial but also deprives society of the jury's role as enunciator of behavioral norms.[4]

The jury system is not a by-product of our English system of justice, it is the catalyst.  Winston Churchill in his seminal work, the *History of the English Speaking Peoples* describes the transition from Germanic to Norman legal principles in England.

> The Norman achievement in England was not merely military in character. [M]uch was preserved of Saxon England. ***The Normans were administrators and lawyers rather than legislators***.  Their centre of government was the royal Curia, the final court of appeal and the instrument of supervision; here were preserved and developed the financial and secretarial methods of the Anglo-Saxon kingdom. The whole system of Saxon local government, also of immense usefulness for the future—the counties, the sheriffs, and the courts—survived.

Churchill, Winston S. (1956). *A History of the English-Speaking Peoples Volume I: The Birth of Britain*. Barnes & Noble, Electronic Edition. (Emphasis added).  The Normans believed in healthily debated rule of natural law; but the Saxons had the courts.

The jury wasn't simply an enlistment of random people; but rather, the jury was composed of men with a stake in the land and its future.

> …William [the Conqueror] took precautions. It became necessary that all feudal controversies arising out of the Conquest should be speedily settled, and it was under the shadow of this menace that Domesday Book was compiled. In 1086 William called together at Salisbury "all the land-holding men of any account throughout England whosoever men they were." The King had need of an assurance of loyalty from all his feudal tenants of substance, and this substantial body bound itself together by oath and fealty to his person.

*Id*. America was created, if not initially, at least by trajectory, to be a community where all opinions mattered. America was not meant[5] to have peasants and serfs, but rather every man was a landowner, and

---

[4] The use of juries also contributes to the corrective justice function of tort law. See Catherine Pierce Wells, Tort Law as Corrective Justice: A Pragmatic Justification for Jury Adjudication, 88 MICH. L. REV. 2348, 2351-52 (1990) (arguing that the structure of tort law adjudication is consistent with the goal of corrective justice).

[5] No Title of Nobility shall be granted by the United States: And no Person holding any Office of Profit or Trust under them, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State.  U.S. Const., Art. I, Sect. 9, Clause 8.

under medieval understanding, a lord.[6] A nation of knights has by-and-large served the American people well in commerce, war, and peace.

The essence of Norman fealty was multi-fold, the gentry owed service to their feudal lords all the way to the King. Fealty also went downward. The Executive promised good governance. Service was principally martial, but also civil – particularly when the Norman lords saw the utility in Saxon principles of the counties, sheriffs, and the courts.

> Thus the landed pyramid rose up tier by tier to the King, until every acre in the country could be registered as held of somebody by some form of service. But besides the services which the man owed to the lord in arms there was the service of attending the courts of the hundred and the county, which were—apart from various exemptions—courts of the King, administering old customary law. The survival of the hundred, the county court and the sheriff makes the great difference between English and Continental feudalism. In England the King is everywhere—in Northumberland as in Middlesex; a crime anywhere is a breach of his peace; if he wants to know anything he tells his officer, the sheriff, to  impanel a jury and find out, or, in later days, to send some respectable persons to Westminster and tell him.

Scandinavian notions of individuality differed radically from continental notions of subservience. Subservience is, at most, a recent American trait. As Churchill explained, the result of the jury may be contrary to the interests of the King.

> But perhaps when [the jury] got to Westminster they told [the King] that he was badly advised, and that they would not pay any taxes *till he mended his ways*. Far ahead we see the seventeenth-century constitutional issue.

(Emphasis added). The seventeenth-century constitutional issues in England referenced by Churchill formed the foundation of the American Constitutional ideals

Here, we see the significance of the jury, not merely as a fact-finding body, but also as a test for the mood and character of the populace.  Mood and character bears minimal relation to the performance of written contracts, wherein the law is inscribed in the four corners of the document. Torts, however, are

---

[6] As of the writing of this brief, it is still Scottish law that ownership of even the slightest amounts of realty entitles one to claim lordship. Scurrilous companies exist to sell fractions of fractions of land for modest amounts of money to allow even the meanest of humanity to brag that he "is a Scottish lord."  https://www.scotlandtitles.com/products/title-pack?gad=1&gclid=EAIaIQobChMI7M2I-PzigQMV19XICh0BWwf1EAAYASAAEgJ-qPD_BwE

the duties that one man naturally owes another – and more significantly here, the consequences of such a breach. If Defendant believes that it was brought to this venue to discuss a contract, it's woefully mistaken.

### 2.  War Is Not Only Hell, but Confusing and Demeaning.

War was always inhumane. To make matters worse, members of one society will betray their fellow members, but also members of the adversary embedded within the society may serve as a 'Fifth Column' to undermine the society under attack.  American actions during World War II were infamous for interning thousands of Japanese-Americans subsequent to the Pearl Harbor sneak attack. This was simplified by the stark differences by Japanese phenotypes and dominant European-American phenotypes. This history has been minutely analyzed and largely condemned.[7]

Internment of innocent[8]  Japanese-Americans received the bulk of the post-war condemnation amid later cries of racism. To assume that racism was the prominent factor[9] is a disservice to our forebearers and patently erroneous. In fact, one Giuseppe DiMaggio, a fishing company owner, had his fishing boat seized on the outbreak of World War II.  DiMaggio was an American businessman, and by happenstance an immigrant from Italy with imperfect immigration records. By the way, he was also the father of Joseph "Joltin' Joe" DiMaggio – New York Yankees superstar.

Joltin' Joe had already received assurances from the American government that he need not enlist or worry about the draft. He was much more valuable to the American war effort as a source of entertainment. Sitting in America's dugout didn't sit right with Joltin' Joe; he enlisted and fought with distinction anyway. Simultaneously, Giuseppe DiMaggio begged and pleaded with the American

---

[7] However, we cannot condemn our past countrymen without noting that the importance of "coast  watchers" in wars of the early-mid twentieth century. In fact, *there was* a Japanese-American in Hawaii that was faithfully reporting to the Japanese government ships entering and leaving Pearl Harbor, Takeo Yoshikawa.

[8] In addition to the arrest of Mr Yoshikawa, there was also the internment of Mrs Motokazu Mori. In a conversation with a Tokyo newspaper reporter she spoke about conditions in Hawaii, for example, flying aircraft overhead, and the presence of large numbers of soldiers and sailors. Further references to flowers were initially thought to be possible code words for battleships and carriers. If so, they were in error. There were no carriers in Pearl Harbor on December 7, 1941.

[9] Often laziness is the root of injustice. Japanese were not interned simply because they were Japanese, but because they were easier to identify in America than Germans and Italians.

government that he had no basis to turn traitor in light of his American investment in both business and family. This time, the government would have its way. Joltin' Joe returned from the war in fine shape, not so his father; Giuseppe's business was crippled, if not ruined, for specious reasons.

Among lessons learned from the internments and seizures of World War II, it is that deprivations of alleged enemy property and rights ought not be based on race on origin, whether or not they are a starting point. Deprivations ought be based on some specific set of facts rather than generic, lazy cliches. The U.S. Supreme Court recognized this in analogous circumstances, for example, the implementation of probable cause: we would stop judging supposed miscreants on the basis of superficial traits, but would rely on articulation of seemingly criminal circumstances. Should Phillipe be considered a Takeo Yoshikawa (certainly guilty), a Motokazu Mori (possibly guilty), or a Giuseppe DiMaggio (not only not guilty, but having a strong interest in the success of the society oppressing him). DiMaggio had a civil rights issue; Hetrick has a commercial issue, but the indignation is the same.

### 3. Second Thoughts on the Law, Broadly

The policy concerning the enforcement of contractual arbitration provisions ought to be viewed in light of applicable Constitutional provisions, the significance of the historical common law, contractual intent, and present common law velocity all weigh in favor of the ignoring the contractual demands for arbitration concerning contractual services. All, i.e. 100%, of this case's causes of action consist of torts. There was a contract between HetCo and Defendant with an arbitration demand for contractual problems. Plaintiffs don't have contractual problems with Defendant, only tortious problems. Defendant defamed Phillipe personally, and then divulged the trade secrets of the company while disparaging it – included the PII of HetCo's colleagues, affiliates, customers, etc.

Phillipe is a Russian citizen. He may resemble and grin like Ron Howard via *Happy Days* but he speaks with an unmistakably Russian brogue that invites stereotyping. It is a pity that Defendant communicated orally with Phillipe rather than in-person/visually. It is appalling that Phillipe's reward for

timely alerting Defendant to a data breach was commercial ostracization. This is unforgivable. In other words, Defendant's theory is that the same entity that alerted it to "hacking" in a manner timely enough to ensure that there were no monetary transfers, was also the same entity that engaged in the hacking. This is vacuous to a degree that can only be blamed on stereotypes.

### 4. Russia's Invasion of Ukraine

Presently, Russia has invaded Ukraine. The United States is backing Ukraine. If publicly displayed flags are a valid barometer, public sentiment lies strongly with Ukraine. Regulations prohibit certain interactions with Russia – at the peril of being associated with Russia. To be associated with Russia is equivalent as being associated with interests contrary to America.

### 5. Defendant's War on Plaintiffs' Character

When Defendant accused Phillipe of treason, and claimed that his business was a front for wiring monies into a war zone to a nominal adversary, Defendant went well beyond contract law, but to the outmost fringes of tort law to engage in a matter of Constitutional/natural law that an arbitration advocate cannot resolve. This case does not involve, say, '200 defective units' from an order of 1000; but rather the inflammatory nature of claiming that an immigrant's business is a false front for the enrichment of an adverse power. No – no, arbitration doesn't apply here – and in the undersigned's humble opinion, it isn't close. No, a party can't vitiate a contract based on treason with specious, clichéd reasons; or at least, without demur and redress. These issues do not bear consultation with a contract guru. This is a cultural issue, and since the very genesis of America's legal system, there has been a top-up view of righteousness, not top-down.

Withholding this case from a jury may not simply be a matter of statute, but a matter of Constitutional law – particularly so for a basis thereof that has been minimized, if not ignored, for at least century.   This Court should retain this case. The United States citizenry may well have a strong opinion on commercial wrongs based on alleged treason. Popular, contemporary writings suggests that they do.

Elsewhere Churchill describes the Boadicean revolution against the Britons' Roman masters in stark terms: "it is the primary right of men to die and kill for the land they in, and to punish with exceptional severity all members of their own race who have warmed their hands at the invaders' hearth."  One might suppose that he was describing Quislings; and perhaps he was, but there was a broader point at stake. A world leader and Nobel laureate historian was telling us about a worldwide, historical trend concerning ire for traitors. But there are other trends, particularly for capitalist societies. If one were to search for a greater observer of humanity than Churchill, one might naturally turn to the prolific author Thomas Sowell, the economic analogue of Churchill as a historian.  Sowell explains that businesses have never really been the bedrock of the dominant culture of any free-market society. As societies historically begrudge economic dominance on Jews for banks and jewelry; Germans for pianos, clocks, and toys; the French for fashion; the Norse for metallurgy; etc, Sowell reminds us that these minority niches are not only healthy, but indispensable and unavoidable for society.[10] How does one reconcile the importance of skilled minorities in peaceful times with their potential of danger in bad times? The undersigned might be a simple devotee of history, but the answer seems clear; the common law, Magna Carta, Constitution, unwritten mores,[11] and founding principles caution that 'We ought decide danger based on contemporaneous facts and circumstances – not stereotypes.'

There is no war that America might wage wherein it lacks a minority population in the crosshairs of suspicion; such is America's magnetism. President Ronald Reagan's dominant legacy among the knowledgeable is that he, with Margaret Thatcher's help, thwarted the war that ought-to-have-been –

---

[10] There are even instances wherein immigrant minorities owned more than half of whole industries of a particular nation: the Chinese in Malaysia, the Lebanese in West Africa, Greeks in the Ottoman Empire, Britons in Argentina, Belgians in Russia… https://www.youtube.com/watch?v=X3rgM4KnYgo&t=225s Excerpted from: Sowell, Thomas. (2013) *Intellectuals and Race*. Basic Books. Electronic Edition.

[11] Immigrants may even be profoundly patriotic. There was a portion of England, so populated by Vikings that upon that it was called "The Danelaw." Harold Godwinson, provisional ruler of England, without compunction, demanded levies from the Danelaw upon Harold Hadrata's Viking invasion, and there is no evidence that these levies were denied him. In fact, after defeating Hadrata, and turning to fight William the Conqueror' sinvasion, Godwinson is recorded as dying in the midst of his Danelaw-Viking 'húskarls' swinging their axes, yelling defiance (possibly while nude and berserk), and refusing *express* quarter from the Norman invaders. The jury may reach the same conclusion and Godwinson and see the patriotism beyond the stereotypes.

World War III. There was a buildup of military and intelligence assets among NATO and the Warsaw Pact, and a conspicuous result of the intelligence assets are the lingering, effects of two camps of hackers, American and Russian.  For some time Anglo-America and Russia built all the world's computers and software!  Russian hackers are the bogey men of American infrastructure – perhaps even rightly so; there is a strong culture in the Soviet-block states of shielding nationals from Anglo-American investigations into computer communications originating therefrom. Stereotypes aren't randomly drawn from a hat; but neither should they be the dominant factor in calculated business decisions.

## II. ENFORCEABILITY OF ARBITRATION PROVISIONS ON PHILLIPE

There is no basis for Phillipe to be included forced into arbitration for his company's contracts. Although Defendant did not explicitly state the legal basis for including Phillipe in arbitration, based on Defendant's legally unsupported conclusion it seems to be groping for the legal theory of equitable estoppel. The doctrine of equitable estoppel precludes a party from asserting rights he otherwise would have had against another when his own conduct renders assertion of those rights contrary to equity. *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH,* 206 F.3d 411, 416 (4th Cir. 2000) (*quoting United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)). This happens when "theories arising out of common law principles of contract and agency law" are used to bind nonsignatories to arbitration agreements. *Id*. at 417 (*quoting Thomson-CSF v. Am. Arbitration Ass'n,* 64 F.3d 773, 776 (2d Cir. 1995)).  Here, Defendant asserts that Phillipe, although not a signatory to the Terms of Use, is nevertheless bound by them.

Generally, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which [it] has not agreed" to arbitrate.  *Id*. at 17.  HetCo may have agreed to arbitrate, but Phillipe did not.

More specifically, the Fourth Circuit holds that "[a] nonsignatory is estopped from refusing to comply with an arbitration clause when it [is seeking or] receives a direct benefit from a contract

containing an arbitration clause." *Id*. at 418 (quotation marks and citations omitted). Therefore the prime issue is whether the Phillipe is seeking a direct benefit from the Terms of Use between Hetco and Defendant.

Because Phillipe is owed natural duties by Defendant, irrespective of the existence of the Terms of Use, namely freedom from character assassination, Phillipe is not seeking a direct benefit from the Terms of Use. The Fourth Circuit faced a similar issue in *R.J. Griffin & Co. v. Beach Club II Homeowners Ass'n*, 384 F.3d 157 (4th Cir. 2004). In *Griffin*, a district court denied a construction company's motion to compel arbitration, under clauses in the general construction contract and the master deed for homeowners, against a homeowners association's breach of warranty suit. *Id*. at 159. As the association was neither a party to the contract, nor in receipt of a direct benefit, the Fourth Circuit affirmed the court's ruling. *Id*. at 166. Notwithstanding that the homeowners association received a benefit from the contract, i.e., the habitability of their houses, it was a benefit owed to them irrespective of the existence of a contract; and the fact that the contract contained a co-extensive duty was irrelevant. *Id*. at 162.

> The legal duties [defendant] allegedly violated arise from its role as the builder of the … condominium; these duties are not dependent on the terms of the general contract. It is true that the formation of the contract meant that [defendant] would construct the condominium, thereby assuming the common law duties South Carolina places on a builder. [Defendant's] assumption of these duties benefitted the [plaintiff], but the benefit flowed from South Carolina law, not from the construction specifications of the general contract… *Even if the [plaintiff] could have asserted a claim against [defendant] for breaching the general contract, that does not mean the [plaintiff] cannot bring a case based on extra-contractual duties that South Carolina law imposes on a builder.*

*Id*. at 162-63.(Citations omitted)(Emphasis added). The comparison is compelling; there perhaps would not have been defamatory statements absent the formation of the relationship between HetCo and Defendant, but Defendant owed duties to Phillipe grounded in Virginia defamation law.

## III.  UNDEFEATABLE PRESUMPTIONS OF VALIDITY

Patent attorneys fondly remember the presumption of validity that existed prior to 2006. Since the enactment of the 1952 Patent Act, statutorily patents were presumed valid. 35 U.S. Code § 282. The Federal Circuit, analogizing intellectual property rights to personal and real property laws, viewed patents as unique pieces of property and decreed that the presumption to issue an injunction in a patent case as nearly automatic. *Richardson v. Suzuki Motor Co.*, 868 F.2d 1226, 1246-47 (Fed. Cir. 1989)(Because the "right to exclude recognized in a patent is but the essence of the concept of property," the general rule is that a permanent injunction will issue once infringement and validity have been adjudged except in exceptional circumstances).  The Supreme Court scoffed at this automatic issuance protocol in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 393-94 (2006), stating that there is no "'general rule,' unique to patent disputes, 'that a permanent injunction will issue once infringement and validity have been adjudged'…except in 'exceptional circumstances.'"

Review of case law related to enforcement of arbitration provisions and their presumption of applicability in this Circuit is reminiscent of the Federal Circuit's pre-2006 attitude.  Judge Harris felt this keenly, too. Why is this statute so powerful? Seemingly the case for patent law's supernatural presumption has more support with its grounding in property law, and also that the drafter of the 1952 Patent Act adopted the principle as the Chief Judge of the Federal Circuit.  The undefeatability of the presumption in this Circuit seems to be a self-fulfilling prophecy; it is undefeatable because it always has been.

## IV.  VIRGINIA OR FLORIDA: WHEN KNIGHTS FORK[12]

---

[12] A fork is a basic chess tactic that consists of a single piece attacking two or more pieces at the same time. The attacking piece is known as the forking piece, while the attacked troops are known as the forked pieces. Knights, notoriously, are the

The standard of applying arbitration to torts arising from relationships that stem from contracts differs between the Fourth Circuit and the Eleventh Circuit. Should this Court choose to analyze this case from contract-to-tort, rather than tort-to-contract, and begin with the four corners of the Terms of Use, this Court will note that there is a Florida choice of law provision. As such the rules discussed earlier in this document concerning the more lax 'foreseeability' standard of the Eleventh Circuit, described above, would apply rather than the more stringent 'substantial relationship' standard of this Circuit.

## V. TRANSFER OF VENUE

Defendant's arguments concerning venue transfer is based on a legally-unsupported premise that the Terms of Use control venue for torts arising therefrom. Naturally, if the Terms of Use arbitration provision – which enjoys a presumption of applicability – does not control, then *a fortiori* the provisions concerning venue – which has no such presumption – cannot either.

A district court has substantial discretion to decide transfer motions by weighing various factors under the broad factors of "the convenience of the parties and witnesses," and "the interest of justice." *Board of Trustees, Sheet Metal Workers Nat. Fund v. Baylor Heating & Air Conditioning, Inc.*, 702 F.Supp. 1253, 1255 (E.D.Va. 1988); 28 U.S.C. § 1404(a). However, the Plaintiff's choice of forum is entitled to substantial weight in determining whether transfer is appropriate. *See e.g.*, *Gulf Oil v. Gilbert*, 330 U.S. 501, 508 (1946). This is especially true when that forum is its home forum. *Baylor Heating*, 702 F.Supp. at 1256. Indeed, the "plaintiff's choice of forum should rarely be disturbed unless the balance of hardships clearly favors transfer." *Eastern Scientific Marketing, Inc. v. Tekna-Seal, Inc.*, 696 F.Supp. 173, 180 (E.D.Va.1988). Courts deciding transfer motions consider: (1) the plaintiff's choice of venue; (2) witness convenience and access; (3) the convenience of parties; and (4) the interests of justice. *Baylor*

---

only unit capable of performing this move against two or more pieces more powerful than it without retribution, e.g., a queen and a rook.

*Heating*, 702 F. Supp. at 1256-62. The burden is on the moving party to show that transfer to another forum is appropriate. *See General Foam Plastics Corp. v. Kraemer Export Corp.*, 806 F. Supp. 88, 89 (E.D.Va.1992). In order to demonstrate that an action might have been brought in a proposed transferee district, the moving party must establish that both venue and jurisdiction with respect to each defendant is proper in the transferee district. *L.G. Elecs. Inc. v. Advance Creative Computer Corp.,* 131 F.Supp.2d 804, 812 (E.D.Va. 2001).

### A. THE PLAINTIFF'S CHOICE OF VENUE IS APPROPRIATE

Plaintiffs comprise a Virginia company and resident and this judicial district is their home forum. It is appropriate to presume that the present action should remain in this forum absent strong evidence to the contrary. *Id*. at 90 (the moving party "must show that 'the balance of convenience among the parties and witnesses is strongly in favor of the forum to which transfer is sought.'" (emphasis retained) (citations omitted)).

### B. WITNESS CONVENIENCE AND ACCESS

Although often highly persuasive, the influence of the convenience of witnesses and access to evidence cannot be assessed in the absence of reliable information identifying the witnesses involved and specifically describing their testimony. *Baylor Heating*, 702 F. Supp. at 1258. Witnesses and their expected testimony must be described with particularity. *Id*. In the present matter, the Defendant asserts in its memorandum that the witnesses will be in Florida, without really any sort of basis for doing so. This is the sort of conclusory statement deemed inadequate by the court in *Baylor Heating*. 702 F. Supp. at 1258 ("[D]efendant's…effort…was merely a conclusory statement that…[out-of-state]…witnesses …would be inconvenienced if the case were to go forward in Virginia. Defendant failed to identify the witnesses and to describe their testimony with the requisite particularity.").

The parties each have their respective forums of Virginia and Florida.  Defendant expects the following witnesses:

- **Phillipe Hetrick**: Phillipe (a VA resident), owner of Hetrick Co, will discuss his business practices, harm to his business, and statements made by agents and owners of both Shanco, Inc. and Feazel, Inc. to him.

- **Joseph Stephens**: Stephens (a DMV resident), a manager of Shanco, Inc. (a Maryland company), will testify to the business practices of Shanco and Feazel, as well as beliefs and remediation steps that Shanco and Feazel made in response to defamatory statements from Defendant. Furthermore, Stephens was privy to the transfer of HetCo's trade secret information from Defendant to Shanco and Feazel, as well as multiple internal meetings of Shanco and Feazel to discuss relationships with HetCo..

- **Defendant Personnel** (generally): Defendant personnel (presumably FL residents) will perhaps play a role in this litigation; however, of greater note will be their electronic mail communications to HetCo., Shanco and Feazel. Statements in oral conversations from Defendant Personnel to Shanco and Feazel found their way into Shanco and Feazel memoranda and communications, most of which Plaintiff possesses already.

- **Shanco Personnel** (generally):  Shanco personnel (presumably DMV residents), other than Stephens, will have a limited role in this litigation. A subpoena to Shanco will suffice to acquire testimony and evidence needed. It is worth noting that Shanco purports[13] to operate in the DMV area. HetCo. has multiple communications in its possession from Shanco featuring representations made by Defendant to Shanco and Feazel.

- **Feazel Personnel (**generally): Feazel personnel (presumably Ohio and North Carolina residents[14]) will have a limited role in this litigation. A subpoena to Feazel will suffice to acquire testimony and evidence needed.  Hetrick Co. has multiple communications in its possession from Shanco and Feazel featuring representations made by Defendant to Shanco and Feazel.

Accordingly, this case will be supported principally by Phillipe's testimony, Stephens' testimony, documents, recording meetings, and meeting minutes.  Virginia and the DMV unquestionably matter the most, being the home of Plaintiffs and the company that severed ties with them, respectively.

### C.  THE CONVENIENCE OF THE PARTIES

"[W]hen plaintiffs file suit in their home forum, convenience to the parties rarely, if ever, operates to justify transfer." *Id*. at 1259 (emphasis added). Thus, this factor weighs heavily against Defendant's

---

[13] https://www.goshanco.com
[14] https://www.feazelinc.com (See the bottom of page for North Carolina and Ohio locations)

request to transfer this action from Virginia. HetCo has been decimated and Hetrick resides here. Defendant was always a larger party than HetCo,[15] so equities concerning financial fairness weigh in favor of Plaintiffs, irrespective of the health of HetCo.

### D.  INTERESTS OF JUSTICE.

The "interest of justice" category is intended to encompass any factors bearing on transfer that are unrelated to convenience of witnesses and parties. *Id*. at 1260. Not much more needs to be said concerning the importance of juries and having the case heard in the situs of the harm.

## V.  PLAINTIFFS' TURN: INHERENT DEFICIENCIES  OF ARBITRATION

Having taken a handful of shots at Defendant for providing unsupported argument, and at the risk of hypocrisy, Plaintiffs would like a turn to share a thought that does not seem present in the caselaw or elsewhere. It seems like a very bad idea to submit submit exotic, criminal torts to an arbitrator – and bad public policy.  In the undersigned's experience, there is significant infrastructure for arbitration of contract matters. Contract matters receive the most efficient arbitration when there are factual issues to resolve, rather than legal issues. Torts can arbitrated handily, but less efficiently than contracts; and there tends to be a wider range of activities for the arbitrators to be (un)familiar. For example, there seems to be a wide range of available arbitrators for, say, automobile accidents and workplace accidents; but very few for, say, rights of privacy.  Arbitration for contract matters and negligence matters permits parties easily to find a veteran litigator with a firm handle on the basics of the caselaw – but that won't be as true for rights of privacy.

The torts brought in this case are largely exotic and based in criminal law. There is little chance but that an arbitrator will be struggling through this case having seen several of these causes of action for

---

[15] https://pitchbook.com/profiles/company/459708-22#captable . For example, Pitchbook indicates that Defendant has undergone multiple seed funding rounds in excess of $2,000,000 (non-cumulative).

the first time. There is no wealth of experience for an arbitrator to draw from in understanding the causes of action, or how a jury might consider the punitive aspects of calling an immigrant a traitor in an area like Northern Virignia. Creativity should not by in the assigned arbitrator's toolkit. In the undersigned's legally unsupported conclusion, this is the sort of law into which only a judge should wade, and circumstances best navigable by a jury. Plaintiffs respond to Defendant's present motion by introducing law that they believe is a matter of first impression in this Court – and this is probably just the start.

## **CONCLUSION**

Rarely does a defendant sprint towards an intentional tort with such careless dedication and verve. This case's fitness for arbitration is arguably non-existent.  Exotic claims, unusual damages pregnant with punitive aspects; this Court should follow the trail uniformly blazed by the Seventh, Eleventh, and Fifth Circuits – and illuminated by the dissent in the *Mey* Court.  This Court should retain jurisdiction and deny Defendant's present motions. Let this case proceed in a Court, guided by a judge and decided by a jury.


Dated: October 13, 2023

Respectfully submitted,


By *M. Keith Blankenship*
M. Keith Blankenship, Esq.
Attorney for Plaintiffs
VSB# 70027
Da Vinci's Notebook, LLC
9000 Mike Garcia
No. 52
Manassas, VA 20109
703-581-9562
keith@dnotebook.com

CERTIFICATE OF SERVICE

I hereby certify that on this date I have filed electronically filed the foregoing document with the

Clerk of Court using the CM/ECF system, which will then send a notice of such filing to the

counsel of record who are registered with the CM/ECF system.


By : _M. Keith Blankenship_
M. Keith Blankenship